Sun v. Xu. Mr. Puknas? Whenever you're ready. Take your time. Thank you, Your Honor. May it please the Court. Good morning. Good morning. My name is Eric Puknes and with me is Herod Javed and we represent the appellants in this case. My plan is to deal with the issues in the order they're briefed, but of course I'll go wherever Your Honors want to take me. I'd like to start with the standard of review. In a case like this, where there's no dispute over what happened, who did what, and when we take the plaintiff's claim of harm on its face, the issue of whether there's an intentional infliction of emotional distress on the conduct that's truly extreme and outrageous or on the harm that's so severe that no reasonable man could be expected to endure it, that reduces to a pure issue of law. And we know this from the Illinois cases that we cite, most significantly Olm v. Memorial Medical Center and then this court in Van Stan v. Fancy Colors overturned a jury verdict of IIED based on its own independent determination of whether the conduct rose to the level of extreme and outrageous as Illinois law requires. But let me comment that because there was a jury verdict in this case, I'm not sure I can jump quite as quickly as you are to the notion that this is all agreed conduct. We have to understand the conduct in the light most favorable to the jury's verdict. And I think there's a lot of debate and a lot of disputes of fact, about motivations, about whether people were telling the truth or not when they said certain things. So I think we need to make sure that factual record is respected as the jury saw it, unless you have some reason for saying that that's not the case. Well, first, for Professor Wong, it's his social media post, which is in the record. It's as it is. So that stands for itself. And then for Ms. Sun, it's the interview, the CBS interview. Those are the issues that were raised for IIED. So let me go with... What about the element of an IIED case that you intended or recklessly disregard the probability that the conduct, the social media post, let's stay with Professor Wong, would cause the You can read the social media post all day, but you're not going to know without a little bit more whether the intent or reckless disregard element was there. And so this is where the objective review that this court has to conduct on appeal comes into play. So let me back up a minute on the intentional infliction of emotional distress. And what we're dealing here is what is, let's deal with the jury verdict, a false accusation of terrible conduct. The false accusation, that's defamation. And the case law makes it clear. And we cite a number of cases in our briefs, specifically in the false accusation, the knowingly false accusation of sexual misconduct. Courts consistently say that's a defamation claim. That's not the realm of IIED. That in IIED, that was created as a gap filler. And so generally, where there is already a traditional source of recovery, defamation in this case, we'll have a defamation case. We have a defamation verdict against Ms. Sun. We don't have any defamation claim against Professor Wong. So we are attacking the defamation verdict against Ms. Sun under the 412 issues. But on this issue, on what was said, that's IIED. And the case law is very clear that if we're going to go down the road of punishing false accusations, that's defamation, not accusation. Well, but it can be, a statement can be both, right? Depending upon those additional factors that the Illinois Supreme Court has identified. In other words, you know, like if there's a disparate power dynamics between the parties and, you know, if one's, if the party making the statements had reason to know that the other party was particularly vulnerable, right? And so those plus factors, let's call them. That's an excellent point, Your Honor. And where my next point was going to go, that if you're going to have speech-based IIED, you need the power differential. You need a, the speaker needs to be speaking from a position of misused authority. And in like maybe a stranger case, if you, well, it couldn't be a stranger, but you know that the victim is particularly vulnerable to the attack that you're about to give. Neither of these are in the record. And in fact, at 8-5 in the district court's denial of the Jamal motion, he actually says, well, one, when he's rationalizing the jury verdict, well, they might have looked at the fact that these two gentlemen are strangers, Professor Wong and Professor Hsu. They barely know each other. And so the jury could have considered that to be an aggravating factor. The case law is exactly the opposite. Like Your Honor said, it's all the cases where there's just speech-based IIED. There's always a power dynamic in play. Well, but there's also another factor is, for example, the motivations behind the speech, right? Or the statements. And so that could be a plus factor depending. And of course, the Illinois Supreme Court gave us the great guidance that, you know what, one might not be enough. All of them might not be enough. You have to look at the totality of circumstances in any regard. But, well, and in this case, every single one of those tallies, I agree that not a single one is dispositive. But every single one of those tallies weighs against IIED in this case. The power dynamic, the knowledge of whether For both Professor Wong and Ms. Sun? On Ms. Sun, I think, given the jury verdict, I think you need to put Professor Wong in a different category than Ms. Sun on just that one issue. But not on the issue of IIED is not appropriate for false accusations of misconduct. On the motivation, there's no dispute over motivation here either. Professor Wong was very, very clear in his testimony. He said, I posted this because I feared that Professor Hsu was looking for university positions in China. And I was alerting the public to his relying on. He had had a personal conversation with a friend of his from two decades earlier who was attacked by Professor Hsu in a hotel room. And Professor Hsu's reputation had followed him for decades throughout. So when Professor Wong was speaking out, there's no dispute over what his motivation was. His motivation was to make sure that the person he considered to be a predator was never again in a position where he could abuse that authority. So again, there's no dispute of fact. It's just we have the facts that are admitted. There's no dispute over it's a legal issue now, whether we have intentional infliction of emotional distress. Was there any evidence in the trial record that Professor Wong was motivated by anything other than that? No. No. The cross-examination was, it focused on, which again, underscores the public nature of the allegations here. It was caught up in the Me Too movement that Professor Wong kind of considered himself a hero of the Me Too movement. So he was taking it upon himself to do this act and alert the media. Now, I want to go, I want to also deal with the issue of whether Professor Wong knew or should have known that these accusations were false. And I think it's important here that, and in the Jamal order, the judge also notes that, well, the jury, the two reasons, the jury said, well, they're strangers. So maybe that's a reason for IED. We know from the case law that's not correct. The other reason was, well, Professor Wong didn't perform an investigation. No case law says an investigation has to be performed, but I think it's meaningful here that Professor Hsu's lawyer did an investigation of the case. He had all the tools available for the federal rules of civil procedure. He deposed people under oath. He followed discovery anywhere he could. And as an advocate for Professor Hsu, took the best evidence he could, put it in front of the judge and said, nobody could believe Ms. Sun. And the district court judge said, no, that's not true. I look at the record, a reasonable juror, a reasonable person could look at Ms. Sun's accusations and still conclude that these terrible acts occurred. Okay, so before you go any further, since I'm looking at the clock, I wonder if we could fast forward from Professor Wong to Ms. Sun and your federal rule of evidence 412 argument. Because as I see the case, it strikes me that there was a jury issue and the jury in its wisdom ruled in favor of Professor Hsu and against Ms. Sun on the IIED claim, but there was this introduction of the evidence of the other relationship. Right, which poisoned the entire proceedings. And it was right at the end, right? It was near the end. It was Dr. Ponton who was testifying. The issue had not come up at all before Dr. Ponton took the stand. And the judge speculated that it might be relevant because perhaps the PTSD that Ms. Sun suffered was caused by this second professor, this second relationship. No witness said that. Professor Hsu's counsel in front of the jury never even argued that that was the case. And the idea that it was fair game to ask Dr. Ponton whether she had considered this second relationship, everybody knew she had considered this second relationship and dismissed it as a cause of any of the harm. Well, everyone knew because Dr. Ponton mentioned it in her expert report, right? Correct, correct. So she's the one that brought the issue to bear. She didn't bring it in front of the jury. Now in discovery... Well, no, I understand that. I understand she didn't bring it before the jury, but she included it as one of the factors she considered in arriving at her damages opinion. She had an initial damages opinion and then this second relationship came up and anticipating that the idea that, well, maybe this second relationship caused the harm, kind of a precautionary note that, no, no, I consider this, it doesn't change my opinion. And so she had her opinion that she gave in her original report. The second opinion was not something that she wanted to discuss in front of the jury. These are just precautionary things, like who knows where it's going to go. And so you need to be prepared just in case, but nobody had it. It shouldn't have been raised. And once it was raised, it caused a harm that the district court judge even agreed to. There's one more point. So let me ask you this. You're not arguing that you're not arguing lack of relevance, right? I am arguing lack of relevance. But if it weren't relevant, why did Dr. Ponton bear to mention it in her report? Because Professor Hsu's counsel was going to make a big deal about it. But aren't you also, I thought you were also arguing 403. Pardon me? I thought you were also arguing 403, that even if relevant, it should have stayed out. Because to the extent it's relevant at all, its prejudicial effect was so far outweighing its relevance. And it has to be reversed. Its relevance needs to be clearly outweighing the prejudicial effect. There's one more thing that the judge said about relevance and why this is the harm that was caused by the testimony and the relevance that it didn't have. And that is, he talks about, well, it's fair game because Dr. Ponton's opinion was that Ms. Sun's PTSD was caused by, and I'm going to quote the district court's order here, directly resulted from her interactions with defendant from a position of authority. That word interactions, that's not a euphemism. That changes the tenor of Professor Ponton's testimony altogether. In an attempt to make this issue relevant, he uses the word interactions. But it wasn't just the interactions with an older professor that caused Ms. Sun's PTSD. Dr. Ponton's testimony was Dr. Hsu raped and beat this woman and then misused his position of authority to exacerbate the problem by threatening to have her kicked out of the country if she raised it. And so by just sort of making this anodyne case of, well, Dr. Ponton said just this relationship with the older professor caused the harm. Here's another older professor, so why don't we ask about that? There's just no relevance at all. The district court had to totally mischaracterize Dr. Ponton's opinion in order to make that relevant. I see I'm out of time and I can save the rest for rebuttal. That's fine. Thank you. Thank you. Mr. Martinkus. Good morning. Thank you for the opportunity to be here. I'm going to start off with Dr. Ponton. You have to understand my position. I received a supplemental report from Dr. Ponton in which she says that there was a second affair that this young lady had with another professor. She was then talking about all the damages related to these professors I asked like three questions. Did you consider what effect, if any, that Mrs. Sun's second relationship had in the allocation of her damages? That's it. And she never really been answered the question. So this is a red herring. This was something that was brought on. I would have the opportunity to cross-examine someone's expert witness with respect to what was considered. Not that I made this up out of thin air. It was in her report. So I don't understand that one at all. Second, I would ask you to really consider something here. Typically, if you complain about officiating, you have to participate in the contest. Here, Ms. Sun and Ms. Zhao never testify. They are offered to appear by Zoom to come into court if they wanted to, but they could do it by Zoom. Anything they wanted to. Let me just, for curiosity, they're back in China now, right? Yes. And were at the time of the trial. Yes. As is Professor Xu, I guess I understand. Yeah. But the court invited them to come and testify on Zoom. The whole essence of what they did was to present my adverse examination during deposition. And now they complain about what the jury did. The jury was presented with such minimal evidence with respect to what, in fact, was their claims. What, in fact, was the basis for the cause of action. You have to understand something too. What is the conduct? When we're looking at extreme and outrageous conduct, it's helpful if we can pinpoint what exactly, and maybe we take each separately, what is the conduct that the jury found extreme and outrageous for Dr. Wang? And then we can take a look at what was the extreme conduct for Sun. Sure. That might be helpful. Can I answer it in reverse touch? Yes. With respect to Sun, you have to understand that in 2019 on Good Morning America, here was a presentation to millions and millions of viewers of people drinking their coffee, where the plaintiff and her lawyer who tried, who has and say, my client was a rapist, my client was an abuser. If that doesn't constitute outrageous conduct, I don't know what would ever do it. With respect to Professor Wang, he posts on Weibo and other Chinese media. So if we say that that's a false accusation, if the representation is that's false, in Illinois, the point of the intentional infliction of emotional stress is that it should shock the consciousness. And so when we're looking at that conduct objectively, the fact that she went on television and made these statements, and so for the jury, the facts that were before the jury, what pushed it beyond First Amendment, first speech? When you go on a national broadcast, and you tell the world that my client is a rapist, a physical abuser, an attempted murderer, that to me, is all of the information needed. If that's not enough. Well, those are highly defamatory statements, for sure. I mean, sure, if they're knowingly false, etc. But I'm nervous about your stress about national media, especially in this era, where everything is global media, you know, you post something on TikTok, or Facebook, or wherever else people post anymore, you know, Insta. And I'm concerned about some rule that relies on the forum. I understand that, Your Honor, but I think this case is really different. Counsel talks about no disputed facts, there are immense disputed facts. We had Dr. Spahn testify on behalf of the university, but after their entire investigation, they found no abuse, they found no rape, they found no attempted murders, they found nothing. The plaintiff, Ms. Soon, testified, I'm sorry, Dr. Spahn testified that Ms. Soon, on about three or four occasions, withdrew all of her allegations, professed her continued love for my client. So here you have the setting where my client is a renowned professor, both here in the United States and through all of his work in China. And out of the blue, he's faced on a morning with this allegation. Immediately, he gets calls from his colleagues. Is this true? Did you really engage in this conduct? So I think there's a big difference between having something that might be of social value presented that has some bearing about anything. But here, there was never a finding of my client did anything, didn't abuse anyone. Counsel, did Mr. Soon's, Ms. Soon's motivations in making these statements get explored during the trial? Judge, I think indirectly, it did. When you have your attorney and you right before you go file a lawsuit, you go on national television, and you present to the world that my client's a rapist, an attempted murderer. I think that is incredible motivation to show that at some point, you're seeking damages against my client. You're trying to get redress against my client. Was it a jolted relationship that she wanted to have? I don't know. But there's certainly evidence to that because I'm looking for, you know, we talked about the plus factors, right? That would elevate defamation to IAED, right? And I'm wondering whether any of those plus factors were disputed with regard to Ms. Soon's statements and whether arguments were made to the jury regarding those factors. Well, Your Honor, I think with respect to Ms. Soon's statements, there's clearly arguments made to the jury that Dr. Spann testified that none of this ever took place. Under the Kolagos case, which I cite too in my brief, I do believe that the nature of the allegations and what was said, in and of itself, in certain cases, can form the basis for the incredible outrageousness and the conduct and severe emotional distress. My client testified to the jury that after this day, within three days, he was a social outcast. In three days, he had all of these in Shenzhen, China, he had all of these different important art gallery things he was doing. All of these got canceled. He had to resign. There's tons of cases, though, in Illinois where it says loss of job opportunity, loss of a job is not enough to elevate it to extreme, causing extreme emotional distress. But this is so much more than loss of a job. It's loss of a reputation. It's loss of any societal values of friends, colleagues. This was devastation. The real issue, from my perspective, too, is Professor Wang told the jury that was his intent. He didn't know my client, really. He had met him one time. He had no dog in this fight. But why doesn't that just make him negligent? I mean, if he should have done more research into what lay behind or didn't lie behind these allegations, then I'm willing to call that negligent. But I'm not willing, it seems a much bigger step to say that this is IIED when we have these national conversations about behaviors that may be reprehensible, maybe they're false accusations. But we have a free environment in which a lot of inaccurate material flies around. Sure. And I would refer to the Snyder case, the United States Supreme Court case, in which there were protesters at a- I know that case quite well. It was certainly not that young man's thing, but the protesters were saying that the U.S. military shouldn't have- That's right. And that's what I draw here, too. This wasn't a case of talking about, generally, what should happen to my client- But it was very targeted in that case. And if you read Justice Alito's dissent, you really do get a sense of how thoroughly targeted it was. It's not so different. I don't disagree with the judge. I think that's exactly right. But in this particular case, Professor Wang was motivated by whatever reasons he wanted to be- He believed her. Maybe he shouldn't have been so gullible if it turns out this was all wrong. You believe someone and you file a suit or you file a broadcast against someone who's a professor or a judge or a lawyer, any of us. We sit there then and not really being able to do anything. Our reputation's ruined. But that happens every day in the United States. Think of the number of people that Donald Trump has defamed as he's gone around. I understand. And it's free speech. The cure for bad speech is more speech, et cetera. Then there shouldn't be any cause of action entitled intentional infliction of emotional distress then. Because the legislature- Well, speech related, there are all kinds of things that people might do that are so outrageous. The question is for each of these people, and the analysis may be somewhat different, that for Professor Wang is his willingness to believe what she said and then take it. He could have called her person X and it still would have been the same cause that he thought he was advancing. Sure. He could have done lots of different things, but here he directly attacked my client and continues to do so. And the other thing too I want to make sure you understand, it wasn't simply on what he had allegedly heard about what happened to Sun. He said for 20 years- Right, there was this other person. ... he's been raping women. All of this, that's not based upon any facts. That's purely speculation, pure intent to destroy my client. And he succeeded. I'll give him credit because he jury, I think, knew that he succeeded. That's why they came back with the verdict they did. I didn't even ask for that much money. They came back with more money than I had even asked the jury to do. This was a case where they came in there and they presented all this and the jury listened to it. If we have any respect for the jury, this is something that was a huge trial. So many dozens and dozens of depositions. This was not a simple case. This went to the jury. Ms. Sun didn't even show up. Ms. Zhao didn't even show up. And the jury got this one right. If you have any questions, I'll be glad to help answer. Thank you. Thank you. Thank you, Your Honor. Just on a final point, this idea that they didn't show up. They were in China during COVID. They couldn't show up. Now, we can second guess whether they should have testified by Zoom or on their depositions. But I think it's unfair to criticize them for not showing up at a time where I think they were physically incapable of coming to Champaign-Urbana. This is part of the lockdown in China? The trial was, yeah, good luck getting out of China during COVID. So that's unfair. And then a few points, but I think, Judge Wood, you picked up on what the main response to a lot of this was the renowned professor. These all show that this is an issue of public concern. And if it's an issue of public concern, the Supreme Court and the Illinois courts say it's not an IIED issue because the First Amendment concerns are too great. Counsel, the appellees say that you waived that issue by not raising it below the district court. We cite in our brief where it was raised below. It was raised both at summary judgment and in the J-Mall. But I don't see any reference to the First Amendment, which is the basis of the whole public concern doctrine, or the words public concern. And so I'm wondering whether that was sufficient to alert at least the district court that that was something that you were arguing. Well, let me start with the idea that someone is going to waive a fundamental right like First Amendment. That's got to be really clear that they're doing it. But here, I agree. They didn't cite Snyder versus Phelps. They didn't use the word First Amendment. But when you look at the Professor Wong in particular, the reason I did this was to alert the public. That is clearly invoking everything that surrounds the First Amendment concerns on IIED. And so the fact that certain magic words weren't used, that doesn't amount to waiver, especially with a fundamental right like the First Amendment. The last point, I'd like two more points. I'm sorry. Counsel, you're out of time. So you're going to have to make it quick, please. Okay. I would just say that not based on facts, the 20-year thing, he had an eyewitness testimony from 20 years ago, a friend who was cornered in a hotel room by Professor Hsu. And that's all the other I don't think I need to address. Thank you. Thank you. Thank you, counsel. We will take the case under advisement. At this point, the court's going to take a brief five-minute recess.